Mark W. COLLMER, Individually and on Behalf of All Others Similarly Situated, Plaintiff

v.

U.S. LIQUIDS, INC., Michael P. Lawlor, W. Gregory Orr, and Earl J. Blackwell, Defendants

Esther Sutch and Milo Sprunger, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs

v.

U.S. Liquids, Inc., Michael P. Lawlor, W. Gregory Orr, and Earl J. Blackwell, Defendants

Jerry A Mercure, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

U.S. Liquids, Inc., Michael P. Lawlor, W. Gregory Orr, and Earl J. Blackwell, Defendants

Gerard Anderson, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

U.S. Liquids, Inc., Michael P. Lawlor, W. Gregory Orr, and Earl J. Blackwell, Defendants

Michael Miller, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

U.S. Liquids, Inc., Michael P. Lawlor, W. Gregory Orr, and Earl J. Blackwell, Defendants

Gurbir Thind, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

U.S. Liquids, Inc., Michael P. Lawlor, W. Gregory Orr, and Earl J.

Blackwell, Defendants

Benn Carmicia, On Behalf of
Himself and All Others
Similarly Situated,

v.

U.S. Liquids, Inc., Michael P. Lawlor,
W. Gregory Orr, Earl J. Blackwell,
Gary J. Van Rooyan, William A. Roth-
rock, IV, Alfred Tyler, II, James F.
McEneaney, Jr., John N. Hatsopoulos,
and Robert A. Ramsey, Defendants

No. CIV.A.H–99–2785, CIV.A.H–99–2831,
CIV.A.H–99–3015, CIV.A.H–99–3036,
CIV.A.H–99–3148, CIV.A.H–99–3796,
CIV.A.H–99–3068.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 23, 2003.

David E. Sharp, Beirne Maynard et al., Roger B. Greenberg, Schwartz Junell et al., Houston, TX, for Esther Sutch, Milo Sprunger.

Paul Paradis, Abbey Grady LLP, New York, NY, Paul Paradis, Abbey Grady LLP, New York, NY, Travis E. Downs, III, Milberg Weiss et al., San Diego, CA, for Esther Sutch, Milo Sprunger, Jerry A. Mercure, Gerard Anderson, Michael NMI Miller, Gurbir Thind, Benn Carmicia.

Thomas E. Bilek, Hoeffner Bilek & Eidman, Houston, TX, for Jerry A. Mercure.

John G. Emerson, Jr., The Emerson Firm, Houston, TX, for Gerard Anderson.

Craig Von Sternberg, Whittington et al., Houston, TX, Marian P. Rosner, Carl L. Stine, James A. Harrod, Wolf Popper LLP, New York, NY, for Michael NMI Miller.

Sherrie Savett, Berger & Montague PC, Philadelphia, PA, Stephen D. Susman, Susman Godfrey, Houston, TX, Jacob A. Goldberg, Berger & Montague, Philadelphia, PA, for Gurbir Thind.

Marc R. Stanley, Stanley Mandel et al., Dallas, TX, David R. Scott, Atty. at Law, Colchester, CT, for Benn Carmicia.

Philip J. John, Jr., Baker Botts, Rebecca L. Robertson, Baker Botts LLP, Houston, TX, for US Liquids Inc., Michael P. Lawlor, W. Gregory Orr, Earl J. Blackwell.

## MEMORANDUM AND ORDER OF PARTIAL DISMISSAL

John G. Emerson, Jr., The Emerson Firm, Houston, TX, Travis E. Downs, III, Milberg Weiss et al., San Diego, CA, Paul Paradis, Abbey Grady LLP, Marian P. Rosner, Carl L. Stine, James A. Harrod, Wolf Popper LLP, New York, NY, for Mark W. Collmer.

HARMON, District Judge.

The above referenced consolidated, securities fraud action, alleges intentional or reckless material misrepresentations and omissions made by Defendants during the Class Period, May 12, 1998 through August 25, 1999,[1] that caused damage to

---

1. The City Environmental, Inc. plant in Detroit, Michigan was acquired by USL on May 8, 1998, four days before the beginning of the Class Period, and became USL's most profitable site.

On August 25, 1999, the Federal Bureau of Investigation executed a search warrant, supported by an August 24, 1999 affidavit containing reports of confidential informants who were long-time employees of USL and the

Plaintiffs and the proposed class of investors and untrue statements and omissions of material facts in USL's March 12, 1999 Registration Statement/Prospectus, grounded respectively in sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Pending before the Court is Defendants U.S. Liquids, Inc. ("USL"), Michael P. Lawlor ("Lawlor"), W. Gregory Orr ("Orr"), and Earl J. Blackwell's ("Blackwell's") motion to dismiss securities suits (instrument # 30) with prejudice for failure to state a claim for which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) [2] and for failure to satisfy pleading requirements of Rule 9(b) [3] and of the Private Securities

Detroit facility, and uncovered illegal dumping of untreated hazardous wastes into the City of Detroit's public sewer system.

**2.** In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. *Id.* The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. *Lawal v. British Airways, PLC*, 812 F.Supp. 713, 716 (S.D.Tex. 1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Nevertheless, conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss. *Fernandez–Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir.1993). Courts need only accept well-pleaded factual allegations as true. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520, 523 (5th Cir.1993); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994) (courts should "not accept as true conclusory allegations or unwarranted deductions of fact.").

In the instant action, as discussed below, Plaintiff must also satisfy the pleading requirements of Rule 9(b) (fraud must be pled with particularity) and for scienter under the PSLRA and Rule 10b–5.

Usually a court limits its review under a Rule 12(b)(6) motion to the facts stated in the complaint and any documents either attached to the complaint or incorporated into it, or it converts the motion to one for summary judgment under Rule 56, with notice to the parties and an opportunity to be heard. Fed.R.Civ.P. 12(c). The Fifth Circuit has held that in reviewing a Rule 12(b)(6) motion to dismiss a claim for securities fraud on the pleadings, the district court may take judicial notice of and consider the contents of relevant public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("the SEC") and are actually filed with the SEC, with the restriction that these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their contents. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996), *citing and adopting rule of Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

Defendants urges that the Court may also consider the full text of documents that are partially quoted or referred to in the complaint. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir.1996). If the plaintiff fails to attach a public document upon which he relies to his complaint, the defendant is entitled to produce such a document in support of a motion to dismiss if the document is integral to the complaint. *Id.* at 809. The Court may also take judicial notice of stock prices and documents of public record. *In re CompUSA, Inc. Sec. Lit.*, 1995 WL 811960, at * 9, n. 14, No. 3:94–CV–1151–H (N.D.Tex. Oct. 30, 1995)1995 U.S. Dist., LEXIS 20333, at *31 n. 14; *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir.1995).

**3.** Rule 9(b) provides,

**Fraud, Mistake, Condition of Mind** In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. *Malice, intent,* knowledge, and other condition of mind of a person may be averred generally.

In securities fraud actions, Rule 9(b) requires a plaintiff to "specify the statements

Litigation Reform Act ("PSLRA") of 1995,[4] 15 U.S.C. § 78u–4[5] *et seq.*

After reviewing the complaint, the briefing on Defendants' motion to dismiss, and the applicable law, for reasons stated below this Court concludes that Plaintiffs have failed to state a claim for which relief can be granted under the Exchange Act of 1934 and the PSLRA, but have stated a claim under the Securities Act of 1933. Moreover, the Court finds that Plaintiffs should be granted an opportunity to replead to cure their complaint's deficiencies.

contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir.) (*citing Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997).

The Fifth Circuit treats a dismissal for failure to plead fraud with particularity under Rule 9(b) as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Lovelace v. Software Spectrum, Inc.,* 78 F.3d at 1017, *citing Shushany v. Allwaste, Inc.,* 992 F.2d at 520.

To establish a claim for securities fraud under § 10 of the Exchange Act of 1934, a plaintiff must prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996). Scienter is " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Id., quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The plaintiff must establish scienter by showing that defendants acted with knowledge or severe recklessness in making misrepresentations. *Id.* at 1018 n. 2. To survive a Rule 9(b) motion to dismiss, a plaintiff must do more than conclusorily allege fraudulent intent; he must set forth specific facts sufficient to support an inference of fraudulent intent (scienter) by either (1) showing a defendant's motive to commit securities fraud or (2) identifying circumstances reflecting conscious behavior on the part of the defendant. *Lovelace,* 78 F.3d at 1018–19.

4. The PSLRA amends the Securities Exchange Act of 1934 and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. Pub.L. No. 104–67, 109 Stat, 737, codified at 15 U.S.C. §§ 77k,

77*l*, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5.

5. Under the PSLRA, 15 U.S.C. § 78u–4(b)(1) & (2),

(b) Requirements for securities fraud actions
(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant—
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made in the light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
(2) Required state of mind
In any private action under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
If the facts are not pled with the requisite particularity, the action is to be dismissed. 15 U.S.C. § 78u–4(b)(3)(A). This provision thus requires a heightened standard of pleading over that set out in Federal Rule of Civil Procedure 9(b), which allows a state of mind, or scienter, to be averred generally. Dismissals for failure to plead fraud with particularity under Rule 9(b) or the PSLRA are treated as dismissals for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *Lovelace,* 78 F.3d at 1017.

This action is only one of a number of class action securities fraud suits on this Court's docket. As a result of extensive research to resolve issues that have arisen in them, the Court realizes that there is a full spectrum of conflicting judicial stances on a variety of issues involving Rule 9(b) and the PSLRA, including scienter, imputing knowledge to individual defendants based on their positions in the company hierarchy or to the company based on the knowledge of its managers and officers, the viability of the group pleading doctrine, fraud based on violations of generally accepted accounting principles ("GAAP"), and application of the bespeaks caution doctrine. Thus a plaintiff can find precedent for almost any stand he wishes to take. Because of this enormous diversity of views, rather than summarize each side's arguments and authority, the Court will summarize the allegations of the consolidated complaint, set out what the Court has determined should be the controlling standards for a motion to dismiss under Rule 12(b)(6), Rule 9(b), and the PSLRA, and apply them to Plaintiffs' pleadings.

### Allegations of Lead Plaintiffs' Consolidated Complaint

USL provides integrated liquid waste management services, including collection, processing, recovery and disposal services. It focuses on industrial and commercial wastewater treatment, although it also collects, processes and disposes of oilfield waste. USL operates forty-one processing facilities and serves over 20,000 customers in various states around the country.

Lead Plaintiffs Kevin Diffley, Arthur Donovan, Jim House and Alan G. Pierce's Consolidated Complaint for Violations of the Securities Exchange Act of 1934(# 27) defines as the proposed class and class period

all persons and entities, other than defendants and their entities, who: (i) purchased the common stock of defendant USL during the period May 12, 1998 through August 25, 1999, inclusive, at artificially inflated prices; or (ii) purchased or otherwise acquired shares of USL common stock in the March 12, 1999 secondary public offering pursuant to the Form S–3/A Registration Statement filed with the SEC on February 24, 1999 and the March 12, 1999 Prospectus, effective March 12, 1999 (referred to collectively as the "March 12, 1999 Registration Statement/Prospectus"), and were damaged by defendants' violations of the federal securities laws.

Complaint at 1–2. Lead Plaintiffs purchased USL common stock at artificially inflated prices during the Class Period and were allegedly damaged thereby.

The consolidated complaint asserts four causes of action, or "counts," against Defendants.

The first count alleges violations of Section 11 (false registration statements) of the Securities Act of 1933, 15 U.S.C. § 77k[6] against all Defendants and viola-

---

**6.** Section 11 of the Securities Act and Section 10(b) of the Exchange Act both require a plaintiff to allege adequately a material misrepresentation or omission. Section 11, 15 U.S.C. § 77k(a), which creates a private remedy for any one who purchases a security based on a materially misleading registration statement, at the time it became effective, in relevant part states,

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or

tion of Section 15 (joint and several liabili-ty of "controlling persons"), 15 U.S.C. § 77o,[7] against the individual Defendants.

partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner . . . .

Under § 77k(f), such individuals are jointly and severally liable.

To prevail on a claim under § 11, a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material, that it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir.1994), *cert. denied*, 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995).

A plaintiff is not required to demonstrate scienter under § 11, and a defendant will be liable for innocent or negligent material misrepresentations. *Id.* Nevertheless, where § 11 and § 12(a)(2) claims sound in fraud, the plaintiff is required to plead the circumstances constituting the alleged fraud with particularity under Rule 9(b). *Melder v. Morris*, 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 & n. 3 (9th Cir.1996), *cert. denied sub nom. Anderson v. Clow*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997).

7. Title 15 U.S.C. § 77o, Section 15 of the 1933 Securities Act, entitled "Liability of controlling persons," provides,

Every person, who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o (West 1997).

To survive a motion to dismiss a claim for controlling person liability under Section 15 of the 1933 Act, a plaintiff must allege "(1) an underlying primary violation of § 11 by the controlled person, (2) control by the defendant over the controlled person, and (3) particularized facts as to the controlling person's culpable participation in (exercising control over) the fraud perpetrated by the controlled person." *Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 637–38 (S.D.N.Y.1999) (applying same test to 1933 Securities Act Section 15 claims and 1934 Exchange Act Section 20(a) claims, 15 U.S.C. § 78t(a)) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable"); *Sanders Confectionery Products, Inc. v. Heller Financial Inc.*, 973 F.2d 474, 486 (6th Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

Because a primary violation of § 11 is a necessary element of a § 15 claim, if plaintiffs fail to state a claim for a primary violation, they also have failed to state a claim under § 15. *Cooperman v. Individual, Inc.*, 171 F.3d 43 52 (1st Cir.1999).

Although whether a defendant is a control person is usually a question of fact, dismissal is appropriate where the plaintiff fails to plead any facts from which it can reasonably be inferred that the particular defendant was a control person. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir.1998); *Sanders*, 973 F.2d at 485–86. Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relations ships, and the power to influence and control the activities of another. *Ellison*, 36 F.Supp.2d at 638.

Count II alleges against all Defendants violation of Section 12(a)(2) (false prospectuses or oral communications) of the Securities Act of 1933, 15 U.S.C. § 77*l*,[8] and against individual Defendants, violation of Section 15 (liability of controlling persons), 15 U.S.C. § 77o, for underlying primary violation of Section 12(a)(2).

Count III alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j,[9] and Rule 10b–5, 17

8. Section 77*l*, entitled "Civil liabilities arising in connection with prospectuses and communications," provides in relevant part,

(a) In general
Any person who—
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
To recover under § 12(a)(2), 15 U.S.C. § 77*l*(2), a plaintiff must demonstrate that the defendant, as a seller of a security, misrepresented or failed to state material facts as to the plaintiff in connection with the sale. *Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir.1981). The plaintiff must also show that he had no knowledge of untruth or omission. *Id.* The plaintiff is not required to show that the defendant acted with scienter or that the plaintiff relied in any way on the defendant's misrepresentations or omissions.

9. Section 10(b) of the Exchange Act in relevant part makes it "unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...":

To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b). Thus Section 10(b) bars conduct "involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation or nondisclosure intended to deceive." *Field v. Trump*, 850 F.2d 938, 946–47 (2d Cir.1988).

To establish a federal securities fraud claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must demonstrate (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *Tuchman*, 14 F.3d at 1067.

Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," is essential to the claim and must be adequately pleaded to survive a motion to dismiss. *Id., quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter may be proved by showing that the defendant acted with severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id., quoting Shushany*, 992 F.2d at 521.

To satisfy the second prong of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct.

C.F.R. § 240.10b–5,[10] against all Defendants.

The last count alleges violation of Section 20(a) (liability of controlling persons and those who aid and abet violations) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t,[11] against the individual Defendants.

978, 99 L.Ed.2d 194 (1988). The Fifth Circuit has stated,

> "Materiality is not judged in the abstract, but in light of the surrounding circumstances." [*Krim v. BancTexas Group*, 989 F.2d 1435, 1448–49 (5th Cir.1993).] The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." [*id.* at 1445] Inclusion of cautionary language—along with disclosure of any firm-specific adverse facts or assumptions—is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the "total mix of information." Nevertheless, cautionary language as such is not per se dispositive of this inquiry.

*Rubinstein v. Collins*, 20 F.3d 160, 167–68 (5th Cir.1994).

**10.** Rule 10b–5, 17 C.F.R. § 240.10b–5, entitled "Employment of manipulative and deceptive devices," provides,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Under the Exchange Act and Rule 10b–5, a plaintiff is given a private right of action "that reaches beyond the statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory*, 114 F.3d 1410, 1417 (3d Cir.1997).

**11.** Section 20(a) of the Exchange Act defines control person liability as follows:

> (a) Joint and several liability; good faith defense
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
>
> (b) Unlawful activity through or by means of any other person
>
> It shall be unlawful for any person, directly or indirectly, to do any act or thing which would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

15 U.S.C. § 78t.

Although worded in different ways, the control person liability provisions of § 15 of the 1933 Act and § 20(a) of the 1934 Act are interpreted the same way. *First Interstate Bank v. Pring*, 969 F.2d 891, 897 (10th Cir. 1992), *rev'd on other grounds*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 & n. 7 (10th Cir.1998). There is a split among the Circuits as to whether in a prima facie case a person must show that the alleged control person actually exercised control over the primary violator's general affairs or merely that the control person had the power to exercise such control. *Maher*, 144 F.3d at 1306 n. 8 (and cases cited and discussed therein). The Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed "the power to control [the primary violator], not the exercise of the power to control." *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir.1993).

Defendant Lawlor was allegedly Chief Executive Officer and Chairman of the Board of Directors of USL until he resigned on January 31, 2000.[12] Defendant Orr served as President and Chief Operating Officer of USL. Defendant Blackwell was Chief Financial Officer, Senior Vice President, and Secretary of USL. During the Class Period all three were contractually bound by "lock-up" agreements with USL's underwriters not to sell any of their shares of USL common stock. Each signed various USL SEC filings during the Class Period. The complaint alleges that the individual Defendants, based on their stock ownership, senior management positions and/or membership on the USL Board of Directors and Committees, were "control persons" within the meaning of Section 15 of the Securities Act of 1933 and Section 20(a) of the Exchange Act of 1934 and allegedly controlled USL's operations and each of the wrongful acts and practices of which Plaintiffs now complain, including material omissions and false and misleading statements in USL's press releases, SEC filings, and Registration Statements/Prospectuses. The complaint further asserts that because of their senior management positions in the company, they had access to undisclosed adverse information about USL's illegal hazardous waste disposal practices, revenues and earnings, directly or indirectly participated in the management of USL, and directly or indirectly were involved in its day-to-day operations and privy to confidential proprietary information about USL and its waste disposal practices, lack of adequate waste treatment, lack of internal controls, business prospects, operations, growth and financial condition. They were also purportedly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information

alleged by Plaintiffs in SEC filings, the Registration Statements/Prospectuses, press releases, and other public documents. Plaintiffs assert that the individual Defendants were aware of or recklessly disregarded the false and material statements issued about USL, approved or ratified these statements, and had the ability or opportunity to prevent their issuance, but failed to do so. Defendants, particularly Lawlor and Orr, knowingly or recklessly purportedly also misled securities analysts about USL's financial performance through telephone conferences, meetings, briefings, and written financial releases, and caused materially false or misleading reports to be issued, thereby causing the analysts to make misleading recommendations and projections to the investing public, which in turn relied on that information in purchasing USL common stock. The investment community and investors allegedly relied and acted on the information communicated in these reports and recommendations about purchasing USL common stock. Individual Defendants were responsible for the accuracy of the public reports and releases and liable for any materially false representations in them. They allegedly also violated their duty to disseminate promptly accurate and truthful information regarding the Company's business, operations, financial condition and performance, growth, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially false.

Specifically, Plaintiffs complain of the following material misrepresentations and omissions during the Class Period regarding USL's business, operations, financial conditions and performance, growth, mar-

---

**12.** Defendants contend that Plaintiffs are mistaken and that Lawlor currently remains in the same positions at USL. Motion to dismiss at 4 n. 2.

kets, management, earnings, and present and future business prospects.

First, Plaintiffs accuse USL of a campaign of rapid acquisition of forty-one waste management companies [13] from November 1996 until October 1999 without conducting proper due diligence or implementing regulatory controls, while falsely representing that USL had done both. Defendants had the resources for modernization and expansion and a determination to grow rapidly by means of acquisitions, emphasis on internal growth, and improvement of existing operations to become the country's leading and dominant provider of services for the treatment, processing, recovery and disposal of nonhazardous commercial waste within the fragmented market of liquid waste disposal, as they repeatedly indicated in filings with the SEC throughout the Class Period. *See, e.g.,* Prospectus filed on June 25, 1998. That market, at the time USL went public in August 1996, was composed of relatively small owner-operated businesses without resources to modernize or expand and typically lacking regulatory compliance programs or oversight. Plaintiffs allege that as the dominant participant in the industry, USL Defendants were aware of and exploited the fact that the majority of state regulators, because of financial and personnel restrictions, were unable to police effectively all the liquid waste disposal occurring in their states and that hazardous liquid wastes were routinely illegally disposed of without any required processing, with illegally altered labels, by illegally mixing wastes, and by illegally falsifying paperwork.

Plaintiffs charge that to meet and exceed quarterly earnings projections, Defendants exploited their lack of compliance programs, easy concealment of liquid, as opposed to of solid, waste, and the silence of loyal employees about unlawful disposal practices. Plaintiffs charge that USL found it much cheaper to violate the law and risk getting caught than to spend the money to establish compliance programs, which Defendants falsely represented were put in place at the time they acquired these small companies. Plaintiffs contend that because of pervasive unlawful practices in the waste disposal business and the fact that many companies acquired by USL had extensive and long-running histories of illegal disposal and other regulatory violations, it was imperative to USL shareholders that Defendants conduct proper due diligence and install compliance programs, both of which they affirmatively misrepresented as having been done.

Second, assert Plaintiffs, Defendants failed to disclose that these numerous acquired companies had extensive histories of environmental and regulatory violations, but instead touted USL's ability to integrate the new businesses to "achieve operating compatibility with maximum speed and efficiency and with minimum disruption of ongoing business." May 12, 1998 S-1/A, at p. 27. For instance, on May 12, 1998, USL represented that it "replaces the acquired business' computer systems with its own management reporting and control system" and attempts to "retain the acquired business' qualified managers and key employees, while consolidating certain overhead functions such as cash management, human resources, fi-

---

**13.** These included American Wastewater, Inc., Enviro Waste Management, Mesa Processing, Inc., T & T Grease Services, Inc., Phoenix Fat & Oils, Inc., Re-Claim Environmental, Inc., Waste Technologies, Inc., Campbell Wells Norm, L.P., Waste Stream Environmental, Inc., Amigo Diversified Services, Inc., National Solvent Exchange Corporation, Parallel Products, Earth Blends, Inc., Waste Research and Recovery, Inc., City Environmental, Inc., and Austin Liquid Disposal.

nance and insurance." *Id.* In the March 12, 1999 Prospectus, USL represented that in the acquisition of these companies, it evaluated facts such as the acquisition candidate's historical and projected financial results, the candidate's customer service reputation and relationship with local communities, and whether the candidate has definable and controllable liabilities, including potential environmental liabilities. Contrary to its repeated representations, however, the complaint charges that USL failed to conduct adequate due diligence in investigating the acquired businesses' liabilities and lengthy histories of environmental violations. Instead, USL repeatedly and systematically ignored repeated violations by these subsidiaries and, after completion of the acquisitions, engaged in a pattern of violating federal and state environmental laws and regulations by illegally disposing of unpermitted liquid hazardous waste into public sewer systems, by falsifying documents submitted to federal and state regulatory officials to create the false impression that the company had properly disposed of such waste, and by falsifying samples that it submitted to federal and state regulators to make USL's practices appear to be in compliance with applicable laws and regulations.

Moreover, by charging customers for disposal services never rendered, as though the hazardous waste disposal had been properly accomplished, USL saved millions of dollars. USL therefore materially understated operating expenses and materially overstated profits and earnings throughout the Class Period, thereby causing the company's common stock to become and remain artificially inflated throughout that time, all in violation of federal securities laws. USL also violated the securities laws by these unlawful practices and by representing that USL was in compliance with applicable regulations when it was not.

Plaintiffs assert that the Detroit, Michigan plant of City Environmental, Inc., a USL acquisition and subsidiary that became USL's most important facility, generating about 25 million dollars annually or 10% of USL's annual revenue, was searched on August 25, 1999, pursuant to a warrant, by federal agents based on a tip from a confidential informant that USL had knowingly discharged liquid hazardous waste into the City of Detroit's public sewer system and had knowingly transported and disposed of hazardous waste at an unpermitted facility without proper manifests. As a result, the complaint alleges, USL was placed under criminal investigation for possible violation of the Federal Water Pollution Control Act ("the Clean Water Act"), 33 U.S.C. §§ 1251 through 1387, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 through 6992k, wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1341.

Plaintiffs rely on the contents of an affidavit of FBI Special Agent Steven T. Flattery, dated August 24, 1999, which established probable cause for and was attached to the search warrant, to support their allegations of wrongdoing (dumping untreated liquid wastes into the sewer system and other illegal disposition of untreated wastes and falsifying tests and facility logs to conceal the practices) at the direction of City Environmental's Gazi George, a Vice President of USL, and Don Roeser, the plant manager.

The information in the affidavit was provided by five cooperating witnesses who were employees of the plant. The first witness stated that he had telephoned Flattery on May 7, 1999 with specific information about USL's mishandling of solid and liquid hazardous wastes. The witness had access to USL processes and records, including treatment logs that tracked the waste that the plant manifested, treated

and released. The witness reported that liquid wastes are treated by adding chemicals which react to form solids. The waste is filtered to remove these solids and the strained solids are pressed into a compacted mass, or "filter cake," which in turn is transported to a disposal site and disposed of for a fee. The witness stated that the filter cake at USL had not operated for two years, and that USL therefore did not have to make payments for the cake disposal. The witness further informed the FBI that Roeser and George were responsible for the illegal activity because they directed USL employees to discharge untreated liquid waste into the Detroit sewer system. He also stated that USL did not treat the waste so that it could save the costs of purchasing chemicals and of properly treating the waste. He further represented that USL falsified its logs to make it appear that treatment, which was not being done, was being done. Moreover, he asserted that USL billed customers for proper treatment even when USL had not processed the hazardous waste.

The second informing witness, a six-year employee of the Detroit plant, was interviewed on July 16, 1999 by Flattery and EPA Special Agent Gregory Horvath. That witness claimed that he was cooperating because of dangerous situations at the plant. He stated that untreated liquid waste was continually discharged into the Detroit sewer system, confirmed that George and Roeser were responsible for the illegal activity, falsified logs to create the appearance that USL treated the waste before it was discharged into the sewer system, maintained that when the City took samples, USL would not discharge any waste or a USL employee would remove the sampler from the sewer, testified that USL falsified documents relating to a rail tank of PCBs that it received from Safety Kleen in Kentucky, and provided false samples and falsified records for inspection. He confirmed what the first confidential informant had said regarding handling of illegal hazardous waste.

Flattery and Horvath interviewed the third witness, a ten-year equipment operator employee at the plant, on July 16, 1999. That witness reported seeing liquid wastes discharged directly into the sewer system without prior treatment and confirmed information provided by the first two witnesses. He further stated that the employees responsible for treating the waste had never been trained in proper waste management procedures nor provided with appropriate materials to treat the waste.

On July 20, 1999, Flattery and Horvath interviewed a fourth witness, who estimated that USL illegally discharged daily between 20,000 and 100,000 gallons of untreated liquid hazardous waste. Falsified logs reported that acids were treated. Moreover, management urged the employees to "get rid of the liquids and do whatever it takes" and instructed them to remove the sampling tubes installed by the City of Detroit to monitor USL's discharged effluent. He told of samples submitted to USL's on-site laboratory being switched and that management told the employees to make a sample fail occasionally so as not to create suspicion about USL's on-site laboratory. He claimed that management told employees to "lie about what was going on at the facility."

The fifth witness, employed at the facility from 1995–1999, was interviewed on July 29, 1999. He stated that he left the job because of the illegal activities that he and others were asked to perform. He informed Flattery and Horvath that he was ordered to remove a monitor put into the plant by the City of Detroit and that he was asked by management to enter false information into a log book.

The agents' information further evidenced that George and Roeser not only

directed employees to discharge untreated waste into the sewer system, but they issued Certificates of Treatment, which assure proper treatment to customers who delivered hazardous waste to the facility and who had to pay for these certificates as part of the charge for handling the waste. The customers routinely paid for and received the certificates even though USL did not process the waste.

Following the August 25, 1999 raid, the Detroit facility was then temporarily shut down for further investigation. Tests uncovered contamination of the site by highly toxic polychlorinated biphenyls ("PCBs"), however.[14] USL negotiated with various environmental agencies regarding disposal of the PCBs and decontamination of the equipment, while the reopening was delayed until USL ultimately entered into a consent decree regarding maintenance and cleanup of the facility.

On January 31, 2000, USL announced that the cost of a PCB cleanup at the Detroit site had exceeded its expectations and that its earnings for the third and fourth quarter of 1999 would be negatively affected. USL's Form 10–Q for the quarter ending September 30, 1999 reported high costs for waste disposal at its Shreveport, Louisiana plant, which USL negotiated with the EPA, in addition to those for investigation and decontamination in Detroit. In the January 31, 2000 press release, USL updated ongoing decontamination, which was complete and awaiting certification, and it announced that it had entered into a consent order with the EPA, which included payment to the EPA to settle the EPA's claims against USL.

On February 28, 2000, in a press release USL announced that at the end of the fourth quarter of 1999, its earnings per share decreased 229.6% to $0.35 per share,

from $0.93 in the same quarter in 1998. It also reported a 34.8% increase in revenue for the fourth quarter, to $58.8 million, from $43.6 million in the fourth quarter of 1998, despite the revenue shortfall of $4.9 million caused by the closure of the Detroit facility. USL also reported that its annual revenue increased 90.8%, to $231.8 million for 1999 from $121.5 million, despite a shortfall of $8.1 million caused by closure of the Detroit plant. Net income decreased 248.3%, to $5.5 million from $3.7 million in the comparable period of 1998.

Then on February 29, 2000, during a conference call to discuss the company's fiscal year 1999 earnings and fourth quarter 1999 results, USL revealed increased costs related to the PCB contamination cleanup in Detroit, the increase in USL's reserve for bad debts to "acceptable levels" with respect to the collection of receivables from its Detroit, Shreveport, and Texas facilities, and expenses relating to a settlement with the Louisiana Department of Environmental Quality relating to its Re–Claim facility in Shreveport, Louisiana for violations of state and environmental laws relating to the monitoring and reporting of discharges and interpretation of certain regulations.

In its aggressive acquisition campaign, USL also acquired Enviro Waste Management, which had a long history of environmental violations and regulatory non-compliance unknown to USL's shareholders, including violations of city waste discharge permits in Texas, illegal sewer tap connections, improper sampling procedures, and deliberate dilution of self-reported samples of liquid wastes processed in the facility.

An acquisition of 1999, the Austin Liquid Disposal Company ("ALD"), also had record of repeated environmental violations,

14. Defendants complain that Plaintiffs attempt to mislead the Court by blurring together the dumping of untreated wastes into the Detroit sewer system with the totally unrelated PCB contamination of the Detroit plant.

including numerous sources of nuisance odor on site that USL chose to ignore.

On June 17, 1997, USL acquired Mesa Processing, Inc., which had engaged in repeated equipment and procedure violations from July 6, 1995 until April 1999. Similarly, USL acquired American Wastewater, Inc. on June 17, 1997. The complaint relates that from December 1994 through September 1999, the Bureau of Air Quality Control of the City of Houston, Texas reported eleven violations of environmental regulations that might be injurious to health and life.

The complaint asserts that USL made false and misleading statements during the second quarter of 1998. In its May 12, 1998 Amended Registration Statement, which was filed in connection with an offering of 3,750,000 shares of USL common stock, USL for the first time included the financial results of its newly acquired City Environmental Detroit facility in its pro-forma financial statements. A section entitled "Risk Management" stated, "The Company has implemented various procedures designed to insure compliance with applicable regulations and reduce the risk of damage or loss. These include specified handling procedures and guidelines for regulated wastes, ongoing training and monitoring of employees and maintenance of insurance coverage."

Based on Defendants' successful (but deceptive, according to Plaintiffs) creation of a positive image for USL, securities analysts issued "strong buy" and "buy" recommendations and emphasized USL's continuing growth and strong growth prospects. See, e.g., Donaldson, Lufkin & Jenrette's June 8, 1998 report by Marc H. Sulman.

On June 25, 1998, USL issued a Prospectus relating to an offering of up to 3,000,000 shares of stock. It repeated the "Risk Management" disclosure of the earlier May 12, 1998 Amended Registration Statement and provided financial data of City Environmental in the pro-form consolidated financial statements. To ensure that the offering would be a success, Defendants allegedly misrepresented that USL was following a well-planned strategy for expansion to achieve a steady revenue growth and increased earnings per share ("EPS") and that existing liquid waste management operations acquired thus far were performing extremely well in financial and operational terms and exceeding Defendants' expectations, as well as being successfully integrated into USL's operations. Defendants also stated that USL was successfully meeting competitive pressures while complying with applicable governmental regulations and restrictions and achieving continuing success. Defendants additionally represented to the investing public that, *inter alia*, USL's plant-level fundamentals were among the strongest in the liquid waste management industry, that its existing operations were generating strong revenue and earnings gains, and that its operating return on investment would exceed 25%.

The June 25, 1998 Prospectus was supplemented by USL public filings with the SEC on July 22, 1998, August 17, 1998, September 1, 1998, September 25, 1998, and November 17, 1998, all with essentially the same allegedly materially false and misleading statements and with updated financials where appropriate. Plaintiffs maintain that these statements were materially false and misleading because (1) USL was not in compliance with applicable regulations; (2) the companies acquired by USL were not properly investigated by USL before their acquisition or, if they were, the illegal activities occurring at them were ignored; (3) its "specified handling procedures and guidelines for regulated wastes" were either illegal as written or thwarted and not followed by USL employees at the direction of USL

management; (4) USL employees were not properly trained in waste management procedures; and (5) Defendants were aware or reckless or negligent in not being aware that USL's proclaimed successful expansion strategy and increased profitability resulted from its illegal charging of its customers for unperformed waste disposal services and artificial inflation of reported revenues, while simultaneously understating its operating expenses because of savings from the nonperformance of proper and lawful waste disposal.

In the third quarter of 1998, USL made additional false and misleading statements. On August 3rd, in a press release announcing financial results for the second quarter, ending on June 30, 1998, USL stated that fully diluted earnings per share rose 100%, to $0.20 from $0.10, in the same period from the previous year. USL reported $28 million in revenues, an increase of 183% over revenue from the second quarter of 1997. Net income increased 250% to $2.1 million from $0.6 million in the comparable period of 1997. Lawlor commented, "To be able to report these results is a real tribute to the employees and management team of U.S. Liquids. The company continues to grow at a rapid pace and it would not be possible to implement our strategic plan without these dedicated people." Orr, in turn, stated, "All of the thirteen acquisitions made during the second quarter have been fully integrated and we are beginning to see the positive effects from the operational enhancements we have put in place . . . ."

The same financial results as were reported in the August 3, 1998 press release were reiterated in USL's 1998 second quarter From 10–Q ("1998 Q2 Form 10–Q"), filed with the SEC on August 27, 1998. In the section entitled "Management's Discussion and Analysis," USL represented that it had achieved dramatic increases in revenue largely because of its acquisitions during the first six months of 1998. Regarding one, the City Environmental Detroit location, which was under federal investigation at the time, USL stated under the subheading "Basis of Presentation," "The condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the [SEC] . . . . In the opinion of management, all adjustments, consisting only of normal recurring adjustments, necessary to fairly present the financial position, results of operations and cash flows with respect to the interim consolidated financial statements, have been included." Lawlor and Blackwell signed the 1998 Q2 Form 10–Q for the second quarter of 1998.

On September 16, 1998, Lawlor made the following representations to the 1998 Donaldson, Lufkin & Jenrette Growth Stock Conference: (1) USL was not experiencing any slowdown in its industrial business; (2) USL enjoyed 30% revenue and EPS growth; (3) USL's acquisition strategy was succeeding, with an acquisition backlog of approximately $350 million, and USL's business condition remained strong; (4) USL would achieve FY98 and FY99 EPS of $.82–.85 and 1.16 respectively; (5) USL was in compliance with all environmental laws and regulations governing its liquid waste management business; (6) USL was successfully integrating its various acquisitions into its business, including into its management and information systems, such that it was achieving significant cost savings and operating efficiencies in its acquisitions that would contribute to continuing strong EPS growth; and (7) because of successful integration of its acquisitions and the economies of scale provided by the acquisitions, USL's operating profit margins were increasing and would continue to increase throughout FY98. Later that day a report about USL by Donaldson, Lufkin & Jenrette's analyst Marc Sulman, issued by the Donaldson,

Lufkin & Jenrette Growth Stock Conference, stated that USL "re-confirmed its revenue and EPS growth targets of 30% a year and reiterated that it had seen no slowdown in any of its industrial businesses. Management also expressed comfort with consensus earnings estimates." On September 23, 1998, Marc Sulman further stated in writing, "[W]e expect USL will continue to aggressively pursue acquisitions within its liquid waste markets, with acquisitions announcements for the third quarter anticipated in the near-term. As well, business conditions remain strong such that our third quarter estimate of $0.23 per share may prove conservative. We continue to rate USL buy."

Plaintiffs allege that all these statements were materially false and misleading again because USL was not in compliance with applicable regulations; the acquired companies had not been properly investigated by USL before their acquisition or illegal activities occurring at them were ignored in USL's rush to acquire them; "specified handling procedures and guidelines for regulated wastes" were either illegal as written or thwarted and not followed by USL employees at the direction of USL management; USL employees were not properly trained in waste management procedures; and Defendants knew or should have known that because of their illegal dumping activities at the Detroit plant, they would have to make substantial expenditures to remain in compliance with federal and state laws, including but not limited to (1) the costs associated with the clean-up of the Detroit facility, (2) the costs associated with outside investigation of its activities, once they were discovered, and (3) fines associated with its illegal actions at the Detroit facility.

The complaint also addresses specific, material false and misleading statements issued during the fourth quarter of 1998. On November 2, 1998, in a press release

announcing its financial results during the third quarter ending on September 30, 1998, USL represented that fully diluted earnings per share rose 44% to $0.26 per share from $0.18 in the third quarter of 1997. It reported a 290% increase in revenues for the third quarter, to $37.5 million from $9.6 million in the third quarter of 1997. Net income increased 161%, to $3.4 million from $1.3 million in the comparable period of 1997, and Orr stated, "The operating results continue to demonstrate the dedication of our employees and the outstanding leadership of our managers ...."

The 1998 Q3 Form 10-Q, filed by USL with the SEC on November 18, 1998, repeated the financial results of the November 2, 1998 press release. Under its subheading "Basis of Presentation," USL represented, "The condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the [SEC] .... In the opinion of management, all adjustments, consisting only of normal recurring adjustments, necessary to fairly present the financial position, result of operations and cash flows with respect to the interim consolidated financial statements, have been included." Lawlor and Blackwell signed this 1998 Q3 Form 10-Q.

On November 3, 1998 at a conference for analysts, money and portfolio managers, institutional investors and large USL shareholders to discuss USL's third quarter results, business and prospects, Lawlor and Orr stated the following: (1) that USL was not experiencing any slowdown; (2) that USL enjoyed 30% revenue and EPS growth; (3) that USL was engaged in a $350 million acquisition backlog, which would allow it to continue to report increasing revenues, net income, and EPS; (4) that USL was in compliance with all environmental laws and regulations governing liquid waste management; (5) that

USL was successfully integrating the new acquisitions into its business, including into its management information systems, and achieving significant cost savings and operating efficiency that would contribute to ongoing strong EPS growth; and (6) that the successful integration of the acquisitions and the economies of scale made for increasing operation profits margins would continue to grow throughout FY98. Plaintiffs contend that these statements were materially false and misleading because Defendants failed to disclose that a substantial portion of USL's revenue and income was the result of their failure to perform services that they pretended they had performed. Instead USL, at the direction of its management officials, was illegally disposing of unpermitted hazardous waste into public sewer systems and falsifying documents that were submitted to federal and state regulatory officials to create the impression that USL had properly disposed of the waste and to conceal its illegal activities. USL also allegedly falsified samples submitted to federal and state regulators so they would believe that USL was complying with applicable laws and regulations, when it was not. Furthermore, the complaint again asserts that the companies acquired by USL were either not properly investigated before their acquisition or their illegal activities were ignored by USL in its acquisition campaign. The complaint also charges that USL's annual and quarterly financial results, as reported during the Class Period, materially overstated USL's net income and assets, in part because of its inclusion of revenues made by illegal evasion of federal law in dumping hazardous wastes at its Detroit and Van Buren sites. The complaint additionally asserts that USL's earning growth was largely due to its illegal dumping at its most profitable site, the Detroit site, which accounted for 20% of its EBIT (earnings before interest and taxes).

The complaint also accuses USL of material omissions and misrepresentations in its March 12, 1999 Registration Statement/Prospectus, which was signed by USL and by each of the individual Defendants. Under the subheading "Failure to Comply with Governmental Regulations" at p. 9, the Prospectus stated, "If existing regulatory requirements change, we may be required to make significant capital and operating expenditures. Although we believe that we are presently in compliance with applicable laws and regulations, our operations may not continue to comply with future laws and regulations." Under the subheading "Acquisition Program" at p. 31, the March 12, 1999 Prospectus stated,

We have disciplined pre-acquisition review procedures for acquisition candidates, including legal, financial, engineering, operational and environmental reviews. The environmental reviews include, where appropriate, investigation of geologic, hydrogeologic and other site conditions, past and present operations (including types of waste processed and disposed of), design and construction records, permits, regulatory compliance history, regulatory agency records and available soil sampling, groundwater and air monitoring results.

Finally, under the subheading "Risk Management" at p. 37, the Prospectus asserted, "We have implemented various procedures designed to ensure compliance with applicable regulations and reduce the risk of damage or loss. These include specified handling procedures and guidelines for regulated wastes, ongoing training and monitoring of employees and maintenance of insurance coverage."

Plaintiffs contend that these statements were also materially false and misleading when the March 12, 1999 Registration Statement/Prospectus was declared effec-

tive for the same reasons indicated previously. First, Defendants failed to disclose that a substantial part of USL's revenue and income came from Defendant's non-performance of services they claimed to have performed. In particular, the complaint reiterates that USL was illegally dumping unpermitted liquid hazardous waste into public sewer systems, falsifying documents submitted to federal and state regulatory officials to make them believe USL had properly disposed of the waste and to cover up its illegal activity, and falsifying samples for federal and state regulators to make them believe the USL's liquid waste practices were in compliance with applicable laws and regulations when they were not and management knew they were not. Other reasons again include improper investigation of acquisition target companies or ignoring their illegal activities, profitability based on illegal charging of customers for waste disposal services that were never performed and understating operating expenses because they were not performed, procedures and guidelines that were illegal or thwarted or not followed by USL employees, lack of training of employees in waste management procedures, and costs that they would inevitably face to be in compliance with federal and state laws. Plaintiffs add that Defendants did not possess "disciplined pre-acquisition review procedures" or did not employ them. They note that Defendants, as officers and directors of USL, were responsible for the preparation of, and were signatories on, the March 12, 1999 Prospectus and were responsible for dissemination of the materially false and misleading public filings. Plaintiffs assert that no Defendant made a reasonable investigation or possessed reasonable grounds for a belief that the public filings were true and not misleading.

Statements issued during the first quarter of 1999 were also false and misleading at the time they were made, according to the complaint. USL's 1998 Form 10–K, filed with the SEC on March 29, 1999, reported USL's financial results for the fourth quarter and year ending on December 31, 1998. It disclosed that revenue increased 304% to $43.6 million in the fourth quarter of 1997, while revenue for the 1998 fiscal year increased 218% to $121.5 million from $38.2 million in the fourth quarter of 1997. Net income increased by 247% to $3.7 million for the fourth quarter of 1998, from $1.1 million in the same quarter of 1997. Net income for fiscal 1998 increased 178% to $10.8 million from $3.9 million for fiscal 1997. USL also reported a 108% increase in diluted earnings per share for the fourth quarter of fiscal 1998, to $0.27 from $0.13 in the same quarter the previous year. USL further proclaimed that EBITDA (earnings before interest, taxes, depreciation and amortization) for the fourth quarter of fiscal 1998 increased 228%, to $9.8 million from $3.0 million in the last quarter of 1997. Moreover, the projected annual revenue for companies acquired during 1998 was reported as $137.7 million.

Lawlor announced that "1998 was the year the U.S. Liquids took a leadership position in the liquid waste services industry." At the same time Orr boasted about USL's "successful integration" of 1998's acquisitions: "The rapid and successful integration of the twenty-nine companies we acquired in 1998 was a tribute to our employees. Their dedication enabled us to perform above expectations." The individual Defendants each signed the 1998 Form 10–K, on page 3 of which USL touted its acquisitions as essential to enhanced revenues and claimed that the acquisition of the twenty-nine businesses "collectively had approximated $136.5 million of annual revenues in 1998." On page 4 of the same document, USL boasted that its Wastewater Division was a major revenue generator that "contributed approximately 85.7%

of our 1998 revenues." The 1998 Form 10–K further represented that City Environmental was operating in compliance with the RCRA; on page 7, it stated that although City Environmental "had never been granted a permit under the RCRA," that it "is continuing to operate under interim status, as allowed by RCRA," and that "all necessary applications and other documentation were timely filed and applicable regulations allow the facilities to continue to operate."

On January 26, 1999, First Security Van Kasper issued a report on USL by John Froley that rated USL as a "Strong Buy" and stated,

> Acquired in April 1998, City Environmental, a former division of USA Waste, operates treatment facilities in Detroit serving customers by truck and rail in the Midwest and the Northeast and represents roughly 8% to 10% of estimated consolidated 1999 revenues.

> We continue to rate U.S. Liquids Strong Buy and are increasing our 12–month price target to $30 per share based on a multiple of 20 times estimated 2000 EPS of $1.55.

At a USL-held conference for analysts, money and portfolio managers, institutional investors and large USL shareholders on February 23, 1999 to discuss USL's Q498 and FY 98 results and its business and prospects, Lawlor and Orr again stated that USL was successfully integrating its acquisitions into its business, including management information systems, was achieving significant cost savings and operational efficiencies in its acquisitions that would support continuing strong EPS growth, that its operating profit margins were increasing and would continue to increase throughout FY99, and that it would achiever FY99 EPS of $1.25.

According to the complaint, these representations were known by Defendants to be false and misleading when issued for the same reasons as earlier ones: much of USL's revenue and income were realized because Defendants were pretending to perform services that they did not perform; dumping unpermitted waste into public sewer systems; falsifying documents and samples to fool federal and state regulators; not complying with applicable regulations; not properly investigating acquisition targets or ignoring their illegal practices; representing that USL was successfully pursuing a well-planned expansion strategy to realize steady revenue growth and increased EPS while they were aware or should have been aware that USL's increased profitability was based on charging customers for services never performed and artificially inflating reported revenues and understating operating expenses because of the nonperformed services of lawful waste disposal; employees using illegal procedures or thwarting or not following legal procedures; lack of employee training in waste management procedures; substantial costs of which Defendants knew or should have known that will be required to achieve compliance with federal and state laws, including clean-up of the Detroit site, investigations of uncovered activity, and fines; overstatement of USL's net income and assets by, *inter alia*, including revenues from evading federal law by dumping hazardous waste at the Detroit and Van Buren sites; and earnings growth from illegal dumping activity at the Detroit site.

The complaint also targets allegedly materially false and misleading statements issued in the second quarter of 1999. On April 6, 1999, USL issued a Prospectus in relation to issuance of 5,020,161 shares of common stock. Its purpose was to issue or reserve shares of common stock from time to time relating to the acquisition of various businesses. The Prospectus stated, "Although we believe that we are presently in material compliance with applica-

ble laws and regulations, our operations may not continue to comply with future laws and regulations." Incorporated into the Prospectus were pro-forma financial statements of USL data from January 1, 1998 through March 19, 1999.

On April 19, 1999 USL issued a Prospectus for the issuance of 1,318,188 shares of common stock. One purpose of the Prospectus was to allow Orr and Blackwell to sell 96,550 and 92,500 shares of common stock, respectively. Although USL was not to receive any proceeds from the sale, it was to pay nearly all the costs of the offering. The Prospectus allegedly contained the same materially false and misleading statement as the April 6, 1999 Prospectus, i.e., "Although we believe that we are presently in material compliance with applicable laws and regulations, our operations may not continue to comply with future laws and regulations."

On or about May 3, 1999, USL reported that in the first quarter of 1999 ("Q199") revenues increased 348% to $55.3 million from $12.3 million in the previous year's first quarter, net income increased 172% from $4.2 million, from $1.5 million the previous year's first quarter, and EPS increased 56% to $.28 per share from $.18 per share in the year ago quarter. Orr stated, "This marks the seventh consecutive quarter since our IPO that we have exceeded consensus estimates. This is something that every employee at U.S. Liquids can take pride in." Lawlor commented, "We have already closed on acquisitions with annualized revenues of $70 million. This raises our confidence in being able to surpass estimates for 1999. Our pipeline of opportunities remains large and active."

In its Form 10–Q for the quarter ending March 31, 1999 ("1999 Q1 Form 10–Q"), filed with the SEC on May 14, 1999 and signed by Lawlor and Blackwell, USL reported increased revenues and attributed

them again to USL's acquisitions in 1998 and the first quarter of 1999. As noted, revenue increased 348% to $43.0 million from the previous year's $12.3 million. Wastewater Division contributed $7.3 million, or 59.4% of first quarter revenues in 1998's first quarter and $50.5 million, or 91.3 of 1999's first quarter.

The complaint reiterates the same reasons to explain why the statements of this quarter were materially false and misleading: much of USL's revenue and income were realized because Defendants were pretending to perform services that they did not perform; dumping unpermitted waste into public sewer systems; falsifying documents and samples to fool federal and state regulators; not complying with applicable regulations; not properly investigating acquisition targets or ignoring their illegal practices; representing that USL was successfully pursuing a well-planned expansion strategy to realize steady revenue growth and increased EPS while they were aware or should have been aware that USL's increased profitability was based on charging customers for services never performed and artificially inflating reported revenues and understating operating expenses because of the nonperformed services of lawful waste disposal; employees using illegal procedures or thwarting or not following legal procedures; lack of employee training in waste management procedures; substantial costs of which Defendants knew or should have known that will be required for compliance with federal and state laws, including clean-up of the Detroit site, investigations of uncovered activity, and fines; overstatement of USL's net income and assets by, *inter alia*, including revenues from evading federal law by dumping hazardous waste at the Detroit and Van Buren sites; and earnings growth from illegal dumping activity at the "most profitable" Detroit site, which the Complaint alleges account-

ed for 20% of USL's EBIT (earnings before interest and taxes).

The complaint charges USL with additional false and misleading statements in the third quarter of 1999. A press release on August 2, 1999 announced USL's financial results for the second quarter of 1999: fully diluted earnings per share rose 45% to $0.29 from $0.20 in the comparable period of 1998; a 110% increase in revenues, to $58. 7 million from $28.0 from the comparable 1998 period; and a 133% increase in net income to $4.9 million from the $2.1 million reported for the second quarter of 1998. Lawlor commented, "Our continued year to year and quarter to quarter improvement in revenue, income, EBITDA and earnings per share demonstrate that our strategic plan is working." The same financial results were printed in the quarterly report filed on Form 10–Q ("1999 Q2 Form 10–Q") by USL with the SEC on August 9, 1999 and signed by Lawlor and Blackwell. The form disclosed that the increase in revenues was again mainly the result of acquisitions. In an August 3, 1999 conference for analysts, money and portfolio managers, institutional investors and large share holders to discuss its Q299 results, business, and prospects, Lawlor and Orr represented that USL engaged a $350 million acquisition backlog that would allow USL to report increasing revenues, net income and EPS; that USL was in compliance with all environmental laws and regulations governing its liquid waste management business; that it was successfully integrating acquisitions into its business and achieving significant cost savings and operating efficiencies in its acquisition, thereby contributing to strong future EPS growth; and that USL would achieve FY99 EPS of $1.25–$1.26.

The complaint asserts that these financial disclosures during the third quarter of 1999 were materially false and misleading for identical reasons given for disclosures in other quarters: much of USL's revenue and income were realized because Defendants were pretending to perform services that they did not perform; dumping unpermitted waste into public sewer systems; falsifying documents and samples to fool federal and state regulators; not complying with applicable regulations; not properly investigating acquisition targets or ignoring their illegal practices; representing that USL was successfully pursuing a well-planned expansion strategy to realize steady revenue growth and increased EPS while they were aware or should have been aware that USL's increased profitability was based on charging customers for services never performed and artificially inflating reported revenues and understating operating expenses because of the unperformed services of lawful waste disposal; employees using illegal procedures or thwarting or not following legal procedures; lack of employee training in waste management procedures; substantial costs of which Defendants knew or should have known that will be required for compliance with federal and state laws, including clean-up of the Detroit site, investigations of uncovered activity, and fines; overstatement of USL's net income and assets by, *inter alia*, including revenues from evading federal law by dumping hazardous waste at the Detroit and Van Buren sites; and earnings growth from illegal dumping activity at the "most profitable" Detroit site, which the Complaint alleges accounted for 20% of USL's EBIT (earnings before interest and taxes).

Finally, on August 25, 1999, trading in USL's common stock on the American Stock Exchange ("Amex") was suspended when it was announced that employees had alleged that USL in its Detroit, Michigan facility had participated in, *inter alia*, illegal dumping of hazardous wastes and that the FBI, EPA, and the United States Attorney General's Office were investigating

the City Environmental hazardous waste facility there. On August 26, 1999, *Bloomberg* news service reported that USL had stated, relating the illegal activities that occurred within the past two years, that it would be fined as much as $50,000 per day and that any employees involved might face imprisonment for up to three years. Orr was quoted as saying, "If it occurred on our watch it's our nickel." As a result market analysts slashed USL common stock's investment ratings and estimates of revenue and earnings. Stock prices plummeted.

The complaint charges Defendants with accounting fraud based on violations of the Generally Accepted Accounting Principles ("GAAP"),[15] recognized by the accounting professions and the SEC as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S–X (17 C.F.R. § 210.4–01(a)(1)) provides that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading or inadequate regardless of footnote or other disclosure unless the SEC has provided otherwise. Plaintiffs contend that USL violated GAAP by recording revenue on services that were not provided. The complaint lists and briefly describes standards that were violated, but fails to identify any specific factual information that should have been provided by Defendants in response to each. Complaint at pp. 43–44.

Plaintiffs contend that the material misrepresentations and omissions about USL's business and financial results and performance noted in their complaint created an unrealistically positive assessment of the company in the market and caused its securities to be overvalued and inflated during the Class Period. They allege that Defendants' untrue portrayal of USL and its financial condition directly or proxi-

---

**15.** In *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 n. 10 (3d Cir.1997) (citations omitted), the Third Circuit explained regarding whether statements that they are consistent with GAAP can still be materially misleading and disclosure violations under the securities laws,

> GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use.... "GAAP [is] an amalgam of statements issued by the [American Institute of Certified Public Accountants] through the successive groups it has established to promulgate accounting principles .... GAAP include[s] broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations. The lack of an official compilation allows for some debate over whether particular announcements are encompassed within GAAP."

If one assumes that sufficient consistency of defendant's earnings statements with GAAP may preclude liability, whether the defendant's accounting practices were consistent with GAAP is a factual question that requires expert testimony. *Id.* at 1421. Moreover, "where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data." *Id.* at 1417–18. *See, e.g., In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712 (3d Cir.1996) (court held that plaintiffs failed to allege facts supporting an inference that Price Waterhouse knew or was reckless in not knowing that Westinghouse's financial statements failed to comply with GAAP because it was using speculative, inflated values in valuing receivables). *See also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir.1999) (While violations of GAAP standards may provide evidence of scienter, the complaint must describe the violations with sufficient particularity, e.g., the approximate amount by which revenues and earnings were overstated, the transactions involved, the identities of customers or employees involved in the transactions).

In the instant action, the Court finds that Plaintiffs have failed to plead these violations with the requisite particularity, but merely generally alleged that they occurred.

mately caused or was a substantial contributing cause of damages to them and proposed class members, who bought and held their stock or sold their stock during the Class Period.

Plaintiffs further assert that Defendants acted with scienter, i.e., that they knew or recklessly disregarded that the public documents and statements issued or disseminated by USL were materially false and misleading, that they knowingly and substantially participated or acquiesced in the issuance or dissemination of the statements or documents in violation of federal securities laws, and that by virtue of their information of the true facts and their control over or receipt of or modification of USL's materially misleading statements or association with USL that made them privy to proprietary information, participated in the alleged fraudulent scheme. Lawlor, Orr, and Blackwell were the top executives of USL and ran it as "hands-on" managers. Through such daily management of USL and their intimate involvement in the acquisitions and investigation of acquired operations, these Defendants knew or recklessly disregarded that untreated liquid waste was being dumped into city sewers and that companies acquired by USL had long histories of regulatory and environmental violations. They also had actual knowledge, based on USL's financial statements, that expenses were artificially depressed because USL was not processing a substantial portion of the waste it purported to be processing legally. They also were aware that once discovered, their illegal dumping activities would result in multi-million dollar fines and financial loss.

Plaintiffs claim that Defendants had a motive, to continue the acquisition strategy by using high priced stock to fund the acquisitions, and opportunity to perpetrate the fraudulent scheme by presenting USL's business in a very favorable light to the investment community so as to inflate the value of that stock to ever higher levels. The inflated rise of the stock's value also allowed USL to issue fewer shares to complete and acquisition, which therefore was less dilutive to USL and its EPS. During that Class Period USL sold six million shares of its stock for proceeds of $120 million, thus profiting from the artificial inflation of the stock price. Furthermore USL's executive compensation structure provided an additional motive for the individual Defendant's participation in the alleged scheme. Each was provided with a "cash bonus incentive plan" whereby he would receive cash bonuses if the growth in USL's earnings exceeded expectations. Each quarter during the Class Period USL reported better than expected earnings because of its fraudulent use of the Detroit site. Thus the individual Defendants received hundreds of thousands of dollars in bonuses.

## Applicable Law

### A. Bespeaks Caution Doctrine

The "bespeaks caution" doctrine is a defense to securities fraud claims that protects statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to "bespeak caution" to investors that actual results may differ, thereby shielding the statements from § 10(b) and Rule 10b–5 liability. See Saltzberg v. TM Sterling/ Austin Assoc., 45 F.3d 399 (11th Cir.1995) (per curiam) (holding that explicit cautionary language in private placement memorandum rendered alleged misstatements immaterial and made them not actionable under "bespeaks caution" doctrine); In re Westinghouse Sec. Litig., 90 F.3d 696, 707 (3d Cir.1996) ("[W]e can state as a general matter that, when an offering document's forecasts, opinions or

projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information[16] the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.").

■ The Fifth Circuit rejects the application of the "bespeaks caution" doctrine as a *per se* bar to liability. *Rubinstein v. Collins,* 20 F.3d 160, 162 (5th Cir.1994). Observing that the use of the doctrine by district courts "reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law," the Fifth Circuit skeptically comments,

> In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—affecting the reasonableness of the reliance on and the materiality of those projections. To put it another way, the "bespeaks caution" doctrine merely reflects the unremarkable proposition that statements must be analyzed in context.

*Id.* at 167 [footnotes and citations omitted]. Under Fifth Circuit precedent, "[C]aution-

ary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, ... materiality is not judged in the abstract, but in light of the surrounding circumstances." *Id.* at 167–68, *citing Krim v. BancTexas Group,* 989 F.2d 1435, 1448–49 (5th Cir.1993). The Fifth Circuit has defined the test: "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.'" *Id.* at 168, *citing Krim,* 989 F.2d at 1445. The court must analyze whether the cautionary language and disclosures of adverse facts affects materiality[17] by examining the particular facts of the case. *Id.* Boilerplate cautionary warnings, general economic information such as that a particular kind of business or industry is inherently risky, etc. do not need to be disclosed because they are already part of the "total mix of information" and are facts and conditions already known to reasonable investors and analysts. *Id.* at 166, 168; *In re Westinghouse,* 90 F.3d at 707 ("Of course, a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections,

---

**16.** *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

**17.** An omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder." *T.S.C. Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Phrased differently, the issue is whether there is a

substantial likelihood that the disclosure would have been viewed by the reasonable investor as having "significantly altered the 'total mix' of information" available to the investor. *Id.* Materiality is generally a question of fact for the trier of fact unless the alleged misrepresentation are so obviously unimportant to the investor that reasonable minds could not differ on the question of materiality, at which point it becomes a question for the court. *Id.* at 450, 96 S.Ct. 2126.

estimates or opinions in the prospectus which the plaintiffs challenge."); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369–73 (3d Cir.1993). Where the warning is in specific language and relates not only the riskiness of the investment but directly addresses the substance of the statement challenged by the plaintiffs, a reasonable factfinder could not conclude that the alleged misrepresentation "would influence a reasonable investor's investment decision." *Trump*, 7 F.3d at 369.

■■■ Moreover the doctrine applies only to forward-looking, i.e., predictive, statements or omissions. *Trump*, 7 F.3d at 371; *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1213 (1st Cir.1996). Therefore, to the extent Defendants contend that the statements in various documents or press releases failed to reflect that USL facilities were out of compliance with environmental regulations at that time the statements were made, the bespeaks caution doctrine is inapplicable.

Insisting that USL did disclose clearly and expressly the risks associated with its liquid waste disposal business, in their motion to dismiss Defendants refer to their March 12, 1999 Prospectus, which stated at p. 10 under the heading "Failure to Comply with Governmental Regulations," that the waste management industry is highly regulated and that USL's finances could be adversely affected if regulators determined that it had failed to comply with applicable laws and regulations:

> Although we believe that we are presently in material compliance ..., [g]overnmental authorities may seek to impose fines and penalties on us or seek to revoke or deny the issuance or renewal of operating permits for failure to comply with applicable laws and regulations. Under these circumstances, we might be required to curtail or cease operations or conduct site remediation until a particular problem is remedied, which could

have a material adverse effect on our business, results of operations and financial condition.

*See also* Ex. E, Form 10–K for 1998, at 11. Never representing that its environmental record was perfect, USL revealed regularly that it had' occasionally been cited for violations of environmental laws and regulations:

> During the ordinary course of our operations, we have from time to time received, and expect we may in the future receive, citations or notices from governmental authorities that our operations are not in compliance with our permits or certain applicable environmental or land use laws and regulations. We generally seek to work with the authorities to resolve the issues raised by these citations and notices. However, we may not always be successful in this regard and future citations or notices could have a material adverse effect on our business, results of operations and financial conditions. Ex. E, Prospectus of Mar. 12, 1999 at 11. *See also* Ex. D, Form 10–K for 1998 at pp. 12, 15–16; Ex. G, Form 10–Q for period ending Mar. 31, 1999 at pp. 8–9.

In sum, they maintain that USL did not purposely mislead investors about possible regulatory action against it and potential negative effects on its financial results.

Defendants further insist that USL also disclosed at great length in its public filings with the SEC its acquisition strategy to acquire relatively small but successful waste treatment companies so that USL could service customers in multiple locations, treat a wider variety of liquid wastes, and enjoy economies of scale. Ex. F, Prospectus of Mar. 12, 1999 at p. 28. Moreover, USL has regularly exposed the dramatic increases in revenues and earnings that it enjoyed largely because of these acquisitions. Nor did it guarantee

investors that this strategy of rapid growth was risk fee; it warned of the dangers of managing and integrating acquisitions. Ex. F, Prospectus of March 12, 1999 at p. 8. For instance, *id.* at pp. 8–9, USL admonished,

> Businesses that we acquire may have liabilities that we underestimate or do not discover during our pre-acquisition investigations. These liabilities may include those arising from environmental contamination or non-compliance by prior owners with environmental laws or regulatory requirements, and for which we, as a successor owner or operator, may be responsible.

Moreover, throughout the Class Period, USL made specific and candid disclosures about the Detroit facility operated by City Environmental. *See, e.g.,* Ex. E, Form 10–K for 1998 at p. 7.

The admonitions about compliance with environmental law identified by Defendants contain broad cautionary warnings about factors such as inherent industry risks, frequency of citations and fines for noncompliance, etc. Even where they address particular problems, however, the disclosures would "not excuse the alleged failure to reveal known, material adverse facts" that Plaintiffs claim exist in USL's current financial condition and business prospects. *Rubinstein,* 20 F.3d at 171 ("the inclusion of general cautionary language regarding a prediction would not excuse alleged failure to reveal known material, adverse facts."); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 544 (5th Cir.1981) (" 'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.' "), *aff'd in part, rev'd in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1982). *See also Gasner v. Board of Sup'rs of the County of Dinwiddie, Va.,* 103 F.3d 351, 363 (4th Cir.1996); *Shaw v. Digital Equip-*

*ment Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996) (the bespeaks caution doctrine does not render a false statement of present fact immaterial as a matter of law); *Harden v. Raffensperger, Hughes & Co.,* 65 F.3d 1392, 1404 (7th Cir.1995) (bespeaks caution doctrine cannot, as a matter of law, render misrepresentations of current fact immaterial). The issue here boils down to whether Plaintiffs have adequately pleaded that the adverse facts of material noncompliance by USL's facilities were *known* to Defendants at the time when they issued their allegedly false statements, i.e., scienter.

**B. Rule 9(b) particularity pleading requirements**

█ The Fifth Circuit requires that securities fraud claims be pled with particularity, i.e., time, place, and contents of the alleged false representations, as well as the identity of the person making the misrepresentation and what that person obtained by the misrepresentation. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994). "[T]his heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and good will, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Id.* at 1067. As will be noted, many of the same purposes were behind the enactment of the PSLRA. Moreover, "[b]y requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mutual Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999).

■ While Plaintiffs conclusorily state they have pleaded with particularity, an examination of the complaint reveals they have stated numerous conclusions without alleging any factual underpinnings. While their core allegations, and indeed their only factually specific claims, relate to the alleged illegal dumping in Detroit, the Court notes that while Plaintiffs claim that customers were charged for treatment of wastes that was never performed, Plaintiffs have failed to provide the details of even a single such transaction or the identity of a single customer. Nor is any information provided on how much Defendants saved by their alleged scheme to dump untreated wastes and bill for unperformed treatment, although the complaint suggests that the amount realized in revenues and earnings was so large that individual Defendants in Houston should have been aware that something was amiss. As will be discussed, moreover, they rely completely on an FBI agent's affidavit, which provided probable cause for the search warrant for the Detroit facility, but that affidavit does not support most of the claims they make.

Regarding the crucial issue of intent, Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Although some courts so rigorously apply Rule 9(b) to securities fraud that the standard is virtually the same as that under the PSLRA, on its face, the PSLRA is more specific, demanding that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Because the standard under the statute is at least as, if not more, specific, the Court will address the issue of scienter under the PSLRA.

### C. PSLRA and the Exchange Act Claims

■ Defendants' motion to dismiss the Exchange Act claims must be viewed in the context of the purpose of the PSLRA, which Congress passed to address the need to deter abusive strike suits[18] of questionable merit by private plaintiffs to obtain large settlement recoveries. H.R. Conf. Rep. No. 104–369, at 31 (1995), 1995 U.S. Code Cong. & Admin. News, p. 730 (noting "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issue," and "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle"), reprinted in 1995 U.S.C.C.A.N. 730, 730. To reduce such suits, the PSLRA imposed significant procedural requirements, including heightened pleading standards, on plaintiffs filing private securities fraud actions. *Id.* at 41.

As noted, to establish a claim for federal securities fraud under § 10(b) and Rule 10b–5, plaintiffs must demonstrate (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiffs relied and (5) that proximately caused them injury. *Tuchman*, 14 F.3d at 1067. The requisite intent, or "scienter," for liability in a section 10(b) and Rule 10b–5 action is "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96

---

18. A "strike suit" is a "[s]hareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefiting [the] corporation on behalf of which [the] suit is theoretically brought." *Black's Law Dictionary* at 1423 (6th ed.1990), *quoted* in *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 n. 5 (1st Cir. 1999).

S.Ct. 1375, 47 L.Ed.2d 668 (1976). "The words 'manipulative and deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional conduct." *Id.* Because not every misstatement or omission in a corporation's disclosures is actionable under the securities law, scienter is the key to determining what is. *Id.*

The Fifth Circuit held prior to enactment of the PSLRA in 1995 that "the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id., citing Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir. 1993), *quoting Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). *See also McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989) (same); *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978). Although Rule 9(b) allows scienter to be "averred generally," case law requires that "the plaintiff must set forth specific facts that support an inference of fraud." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994). These specific facts must "make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Id.* The plaintiff can be satisfied by pleading facts showing a defendant's motive to commit securities fraud or, where the motive is not evident,

by the more difficult method of "identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.*

The PSLRA, 15 U.S.C. § 78u–4(b)(2), provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Moreover, if plaintiffs fail to meet this heightened pleading requirement, a court may, on any defendant's motion, dismiss the complaint. 15 U.S.C. § 78u–4(b)(3). The PSLRA does not define what is meant by "the required state of mind." The Circuit Courts of Appeals addressing the question have split into three different positions on the issue.

Like the Fifth Circuit, before the passage of the PSLRA, which eliminated any general pleading of scienter, all the Circuits addressing the issue of scienter held that some form of recklessness is a sufficient state of mind to state a claim for securities fraud under § 10(b) and Rule 10b–5, but were split as to what facts must be pled to avoid a 12(b)(6) dismissal. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1281 (11th Cir.1999).

The Second Circuit, prior to the PSLRA required,

> Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that defendants had both motive and opportunity to com-

mit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995), *quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). The Second Circuit defined motive and opportunity as follows:

> Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*Shields*, 25 F.3d at 1130. The appellate court made clear that motives possessed by nearly all corporate insiders, e.g., wish to uphold a high corporate credit rating, to sustain an image of profitability or successful investment, to insure a high stock price to increase executive compensation, or to prolong the benefits of being a corporate officer, were not sufficient; plaintiffs must plead that the defendants benefited in a concrete and personal way from the alleged fraud, such as misrepresenting corporate performance or prospects to artificially inflate the price of stock while the corporate insider sold his own shares at a profit. *Novak v. Kasaks*, 216 F.3d at 307–08. If plaintiffs chose to plead facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness

by defendants, "intentional misconduct" is conduct that "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or knowing sale of a company's stock at an unwarranted discount." *Id.* at 308.

After passage of the PSLRA, the Second and Third Circuits [19] concluded that the PSLRA, in essence, adopts the first portion and expressly tracks the second part of the Second Circuit's test, thus codifying the Second Circuit's pre-PSLRA case law permitting plaintiffs to plead intent by alleging facts showing either (1) that defendants had both motive and opportunity to commit fraud or (2) that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168–69 (2d Cir.2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir.1999); *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir.2000). The Second Circuit, aware of Congress' failure to include language about motive and opportunity in the PSLRA, minimally modified its test by stating that the court "need not be wedded to these concepts in articulating the prevailing standard" for pleading scienter. *Novak*, 216 F.3d at 310. A bare invocation of these "magic words" is insufficient; facts regarding the particular circumstances will make "motive and opportunity probative of a strong inference of scien-

---

**19.** These courts concluded that because Congress specifically incorporated the Second Circuit's "strong inference" language into § 78u–4(b)(2), the PSLRA sets out a pleading standard equal to that of the Second Circuit and reflects an intent to import the judicial interpretations of that language. *Novak v. Kasaks*, 216 F.3d at 310. Citing the legislative history, the Second Circuit concluded that Congress chose its pre-PSLRA standard because it was "the most stringent in the nation." *Id.*, citing H.R. Conf. Rep. No. 104–369. at 41. Although conceding that the legislative history of the PSLRA contains "con-

flicting expressions of legislative intent" regarding the pleading standard, the Ninth Circuit points out that the Senate Committee reporting the bill state that it was proposing not " a new and untested pleading standard that would generate additional litigation," but rather "a uniform standard modeled upon the pleading standard of the Second Circuit." *Id.* at 311, *citing* S.Rep. No. 104–98, at 15 (1995), *reprinted in* 1995 U.S.C.A.A.N. 679, 694 (noting that courts interpreting proposed "strong inference" standard might find Second Circuit case law "instructive.").

ter." *Id.* at 311. Thus, according to the Second Circuit, a strong inference of fraudulent intent "may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that their public statements were not accurate ...; or (4) failed to check information that they had a duty to monitor ...." *Id.* Furthermore, the Second Circuit has at times permitted allegations of simple or non-deliberate recklessness to satisfy the scienter standard where the defendant had a duty to monitor certain information and failed to do so. *Novak,* 216 F.3d at 308–09.

At the other end of the spectrum, the Ninth Circuit has concluded that the PSLRA substantively changed the level of scienter and required a higher, or more demanding, pleading standard than the Second Circuit's. The Ninth Circuit has rejected the motive and opportunity test in favor of pleading "facts that come closer to demonstrating intent," and has refused to adopt the strong inference standard for simple recklessness, insisting that the PSLRA has substantively enhanced the scienter requirement to, at minimum, "deliberate recklessness." [20] *In re Silicon Graphics, Inc.,* 183 F.3d 970, 974 (9th Cir. 1999). The Ninth Circuit views the PSLRA as expressly adopting only the Second Circuit's "strong inference standard" and as expressly refusing to codify the Second Circuit's case law and motive and opportunity test. *Id.* Moreover, it reads the statute's factual particularity requirement as mandating that the plaintiffs

"provide a list of all relevant circumstances in great detail." *Id.* at 984. For instance, if a report is the alleged source of the defendants' actual or constructive knowledge, plaintiffs must provide at least some specific "adequate corroborating details," e.g., the sources of plaintiffs' information about the report, how plaintiffs learned of it, who drafted it, which officers received it, and a description of its contents. *Id.* at 985. Regarding insider stock trading and pleading sufficient facts to give rise to a strong inference of scienter (deliberate recklessness), the Ninth Circuit states that insider trading "is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Id.* at 986, *quoting In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989). A district court needs to consider (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history. *Id.* In determining whether the sale was unusual or suspicious, it should examine the proportion of shares actually sold by the insider to the volume of shares he could have sold. *Id.* Furthermore, the Ninth Circuit does not accept as sufficient for establishing scienter the pleading, by itself, of the temporal proximity of an allegedly false optimistic statement and a subsequent disclosure. *Yourish v. California Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

In view of the fact that at the 12(b)(6) motion stage of litigation there has been no discovery, this Court finds that the

---

**20.** Adopting the Seventh Circuit's definition, the Ninth Circuit defines "deliberate recklessness" as a "form of intentional or knowing misconduct" in much the same way as the courts of appeal discussed above: "[R]eckless conduct [is defined as] ... a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Silicon,* 183 F.3d at 976.

Ninth Circuit's requirement of nearly complete details regarding every material aspect of the litigation to be excessive, harsh, and unfair.

In the middle, between the Second and Ninth Circuits' pleading standards under the PSLRA, the Eleventh, Sixth and First Circuits also reject the Second Circuit's relatively easily met motive and opportunity pleading standard, standing alone, which they also maintain that the PSLRA did not codify, as sufficient to plead scienter unless the facts pled regarding motive and opportunity demonstrate that the defendants acted recklessly or knowingly. *Bryant*, 187 F.3d at 1283; *In re Comshare Sec. Litig.*, 183 F.3d 542, 551 (6th Cir. 1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir.1999). They hold that the operative language of the PSLRA, i.e., that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with *the required state of mind* [emphasis added]," upholds the established judicial rule of which Congress was well aware that the

pleading of specific facts denoting severe recklessness is sufficient to state a claim. *Bryant*, 187 F.3d at 1283. For these Circuits, scienter "encompass[es] at least a showing of severe recklessness"; thus the PSLRA did not substantively change the actionable level of scienter. *Id.* at 1286; *Greebel*, 194 F.3d at 199–200, 201.[21] The First Circuit has held that "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Greebel*, 194 F.3d at 195. In support of their conclusions, the Sixth and First Circuits emphasize, in contrast, the express requirement for a scienter of "actual knowledge" that a forward-looking statement was false or misleading a standard necessary to defeat the safe harbor defense of a defendant under 15 U.S.C. § 78u–5(c)(1)(B), instead of a the inferred scienter of recklessness with respect to securities fraud claims under § 10(b) and Rule 10b–5. *Bryant*, 187 F.3d at 1286; *Greebel*, 194 F.3d at 201. The Sixth Circuit stated, "To the extent that the effort in *Silicon Graphics* is an attempt to import into the law a new and uncertain

**21.** Portions of the legislative history support their rejection of the motive and opportunity test, as discussed in detail by the First Circuit in *Greebel*, 194 F.3d at 194–96 and summarized as follows. Congress stated, "The Conference Committee language is based in part on the pleading standard of the Second Circuit" and that "[b]ecause the Conference Committee intends to strengthen the existing pleading standards, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R. Conf. Rep. 104–369, at 41 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 740. An added footnote states, "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." *Id.* at 41, n. 23, reprinted in 1995 U.S.C.A.A.N. at 747. Furthermore, although the Senate bill (S.240) contained an amendment that would have codified the Second Circuit law, the Conference Committee deleted it. Amend. 1485, S. 240, 104th Cong., 1st Sess. (1995). In addi-

tion, President Clinton, who vetoed the bill but was later overridden by Congress, stated that through the PSLRA Congress "intended to 'strengthen' the existing pleading requirements of the Second Circuit ... [and] to erect a higher barrier to bringing suit than any now existing[.]" H.R. Doc. No. 104–150 (104th Cong.), 1st Sess.(1995), 141 Cong. Rec. H15214 (Dec. 20, 1995).

The First Circuit has conceded that "[t]he legislative history is inconclusive on whether the Act was meant to either embody or to reject the Second Circuit's pleading standards." *Greebel*, 194 F.3d at 195, *citing* the Third Circuit's *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531–33 (3d Cir.1999) (ignoring legislative history because of contradictions and lack of clarity). The First Circuit concludes, "At best, there appears to have been an agreement to disagree on the issue of Second Circuit standards (other than the strong inference standard), and perhaps, as is common, to leave such matters for the Courts to resolve." *Greebel*, 194 F.3d at 195.

super-recklessness, *see* 183 F.3d at 979 ("deliberate or conscious recklessness"; "degree of recklessness that strongly suggests actual intent"), we believe that the intent is inconsistent with the plan statutory language." *Bryant,* 187 F.3d at 1286.

The First Circuit, moreover, has indicated that because a strong inference of scienter, rather than merely a reasonable inference is now required to survive a motion to dismiss, evidence of mere motive and opportunity to commit fraud would not be sufficient unless it rose to the level of creating a inference of reckless or knowing conduct. *Greebel,* 194 F.3d at 196–97. Thus standing alone, a single characteristic fact pattern, such as one of the following examples, would not constitute pleading sufficient to raise a strong inference of scienter: insider trading, divergence between internal reports and external statements on the same subject, proximity of an allegedly fraudulent statement or omission and a later disclosure of inconsistent information, evidence of bribery by a top official, existence of an ancillary lawsuit charging fraud by a company and that company's quick settlement of the suit, disregard of the most current factual information before making statements, the personal interest of certain directors in not informing disinterested directors of an impending sale of stock, and the self-interested motivation of defendants in saving their salaries or jobs. *Greebel,* 194 F.3d at 196. Instead, under the PSLRA, a court must examine the particular facts of each individual case to see whether they support a strong inference of scienter or reckless and knowing conduct, not merely a reasonable inference, to survive a motion to dismiss. *Id.* at 196–97. In a statement relevant to the instant case, the First Circuit notes that "[u]nusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Id.* at 197, *citing inter alia Rubinstein,* 20 F.3d at

169–70. Nevertheless, it cautions that "mere pleading of insider trading, without regard to context or strength of inferences to be drawn, is not enough. . . . At a minimum, the trading must be in a context where defendants have incentives to withhold material, nonpublic information, and it must be unusual, well beyond the normal patterns of trading by those defendants." *Id.* at 198.

Even in pre-PSLRA cases of securities fraud, in applying Rule 9(b) scienter requirements established by case law, the Fifth Circuit made clear that alleging that the defendants engaged in fraud in order to inflate a company's common stock for a successful offering or to protect and enhance their executive positions, and the substantial compensation and prestige attending their official roles, or enhancing the value of their personal company holdings and options is not sufficient to support the requisite inference of scienter. *Melder,* 27 F.3d at 1102; *Tuchman,* 14 F.3d at 1068–69. Indeed, the *Melder* panel observe, "Accepting the plaintiffs' allegation of motive—basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirements as to all corporate officers and defendants." Rather, plaintiffs must identify specific corporate defendants that actually personally profited from allegedly inflated stock values, with particular facts upon which a inference of conscious behavior can rest. *Melder,* 27 F.3d at 1102–03. Mere conclusory allegations that the defendants, because of their membership and/or their executive and managerial positions with the defendant company, knew or had access to information that was adverse and nonpublic do not plead scienter adequately. *Id.* at 1103.

After reviewing the appellate law, the legislative history of the PSLRA available

in U.S.C.A.A.N., and the complaint, the Court concludes that the appropriate standard of scienter is that persuasively set forth by the Sixth, First and Eleventh Circuits. It best suits the purpose of the PSLRA amendments to stem abusive securities fraud litigation and tracks the plain language of the statute. Thus the Court pursues a fact-intensive review of this particular case to see whether Plaintiffs have pleaded sufficient facts to state the requisite scienter.

Thus facts suggesting motive and opportunity are factors that may be weighed in determining whether scienter exists but in the instant action are negligible. The Court concludes that Defendants' alleged motive, i.e., to inflate the value of USL's common stock to fund its acquisition of more companies in its effort to dominate the liquid waste disposal interest is merely another example of a motive common to innumerable public corporations that is accordingly insufficient to constitute scienter under the PSLRA. Instead, even under the Second Circuit standard, Plaintiffs must allege that individual Defendants benefitted in a concrete and personal way from the alleged fraud sufficiently to give rise to a strong inference that Defendants acted with the required state of mind. *Novak*, 216 F.3d at 311. Plaintiffs have failed to do so here. Indeed, they provide no credible reason why Defendants would scheme to raise the price of stock by violating environmental laws in a manner at the risk of enormous criminal and civil liability.

Nor, the Court notes, is there any insider trading alleged or involved in this action because Defendants, as stated in the complaint, were bound by a lock-up agreement not to sell their stock, and thus there is no allegation of individual profiteering by selling stocks at artificially high levels. Even then a conclusory statement would have been insufficient; Plaintiffs would have had to delineate unusual trading at suspicious times and in suspicious amounts by corporate insiders, out of line with prior trading practices, for such conduct to be probative of scienter. *Rubinstein*, 20 F.3d at 169–70; *Shaw*, 82 F.3d at 1204; *Greebel*, 194 F.3d at 197, 206.

Thus in the instant action the crux of adequacy of pleading the requisite intent to defraud comes down specifically to allegations relating to what and how the individual Defendants knew or should have known about USL's alleged multi-facility illegal waste disposal practices that they consciously or with severe recklessness ignored and misrepresented to the investing public, i.e., material facts that would substantially damage USL's business and diminish the value of its stock. Moreover, for joint and several liability (as opposed to individual liability) and purposes of 10b–5, "knowingly commits a violation of the securities laws" requires "actual knowledge" that a representation is false, or that an omission renders a representation false, is required. § 78u–4(f)(10)(A). "Reckless conduct" is specifically excluded for joint and several liability. § 78u–4(f)(10)(B). *Greebel*, 194 F.3d at 200. Plaintiffs have alleged that (1) individual Defendants had access, by reason of their positions at USL, to information, reports, etc. about serious noncompliance with environmental rules and regulations; and (2) George and Roeser's purported deliberate ordering of the illegal dumping and its cover-up in Detroit should be imputed to individual Defendants.

First, the Court observes, the vast majority of statements described in the complaint have not been challenged facially for inaccuracies or misrepresentations. Instead, Plaintiffs' accusations are directed essentially to the following representations, which they repeat in laundry list fashion in response to each statement is-

sued by Defendants, as untruthful and misleading at the time they were made by Defendants: that USL was in compliance with environmental laws and regulations; that it was screening target acquisitions with due diligence; that it was successfully integrating its acquisitions into its business; that it was instituting procedures and training for the handling of hazardous wastes by its new facilities; that its increasing revenues, earnings, and profits were the result of economies achieved because of such acquisitions when they actually resulted from the fraudulent nonperformance of and billing for treatment and disposal of hazardous waste.

▪ In the instant case, Plaintiffs merely conclusorily and minimally allege that several of USL's facilities were out of compliance with environmental regulations during the Class Period, particularly at the time the March 12, 1999 Registration Statement/Prospectus stating otherwise became effective. Such general allegations are an inadequate and nonspecific basis for inferring scienter, which under both Rule 9(b) and the PSLRA, must be pled with particularity. Similarly the allegations that USL failed to conduct due diligence, deliberately targeted acquisitions with histories of environmental violations, and did not implement environmental compliance procedures and policies in its various facilities are purely conclusory without particularized supporting facts relating to these acquisitions other than the Detroit facility, in sum insufficient to raise a strong inference of scienter.

Moreover, Plaintiffs persuasively show that the affidavit prepared by FBI agent Steven Flattery (Ex. A to # 34) to support his request for a warrant to search the premises of City Environmental in Detroit, does not support Plaintiffs' complaint's broad and globally applied allegations. It does not describe "wide-spread illegal environmental practices throughout the Company," but alleges that two employees of City Environmental directed subordinates to dispose of liquid wastes in the sewer system without pretreatment and then covered up their wrongdoing, a charge that undermines Plaintiffs' allegations that the flagrant violations could have been uncovered in a due diligence review. The affidavit does not mention any other USL facility or any of the Defendants. It does not state that USL failed to conduct due diligence in its acquisition of City Environmental or of any other facility. Nor does it state that USL deliberately chose to acquire companies with long histories of environmental violations. It does not state that City Environmental had such a history. Moreover, it does not say that USL failed to implement compliance procedures at the companies it acquired. It does not state that City Environmental communicated with USL headquarters on a regular basis. What it does reflect is five witness's testimony about wrong-doing in one plant under the direction of two men.

Furthermore the critical point of Defendants' alleged scienter is the individual Defendants' purported knowledge or reckless disregard of the deliberate illegal dumping of nontreated hazardous waste, by USL's Detroit facility under direction of officers George and Roeser of its subsidiary, City Environmental, into the city sewer system and the deliberate cover-up of that practice. There is no question in this Court's judgment that the gravity of the wrongdoing in Detroit, if individual Defendants knew or should have known of it, would have been material to the investing public. Without a factual basis for inferring that the individual Defendants did know or should have known about the misconduct directed by George and Roeser and thus of the falsity of their statements to the investing public, however, Plaintiffs' complaint fails to plead the scienter necessary to state a claim for securities fraud under the Exchange Act.

In an effort to impute Roeser and George's deliberate misconduct in Detroit to individual Defendants in Houston to establish scienter, Plaintiffs have relied on the judicially created presumption that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D.Wash.1998). This Court observes that *Epstein* issued before the Ninth Circuit's opinion in *Silicon Graphics* and may not be viable in light of the appellate court's requirement of highly particularized scienter allegations. *See, e.g., In re Read–Rite Corp. Sec. Litig.*, No. C 98–20434 JF, 2000 WL 1641275, *5–6 (N.D.Cal. Oct.13 2000)("Epstein presumption cannot save the present pleading from a motion to dismiss" where "Plaintiffs have not otherwise adequately alleged specific particularized facts supporting a strong inference of scienter").[22] Indeed, the purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter. *See, e.g., In re Splash Technology Holdings, Inc. Sec. Litig.*, No. C 99–00109 SBA, 2000 WL 1727377, *21 (N.D.Cal. Sept.29, 2000)(boilerplate pleadings such as that defendants were "hands on" managers or in "constant contact" with wrongdoers or had "direct access to information" from them based on unspecified documents, conversations, meetings, reports, etc. are insufficient as alleged source of defendants' knowledge of critical facts).

■ Similarly, an issue regarding application of the group pleading doctrine has arisen regarding Plaintiffs' effort to impose liability on Defendants who may not have made material misrepresentations and omissions. Under the "group pleading presumption," a company's statements "in prospectuses, registration statements, annual reports, press releases, or other group-published information" may be presumed to be the collective work of those individuals with direct involvement in the everyday business of the company. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999). Thus if the group pleading doctrine applies, the plaintiff is relieved of his Rule 9(b) and/or PSLRA burden of attributing statements to a particular defendant with scienter, but the plaintiff must still plead both the circumstances of the alleged misleading statements and of the falsity with particularity. *Splash*, 2000 WL 1727377, *25. No Circuit court has addressed the question of whether the doctrine survived the enactment of the PSLRA with its particularity in pleading requirements.

The district courts that have considered the question are of divergent views. Courts concluding that the group pleading presumption is no longer viable after the passage of the PSLRA include *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 916 (N.D.Tex. 1998)(since PSLRA requires plaintiffs to set forth facts raising a strong inference that each defendant acted with the required state of mind, group pleading is inconsistent with 15 U.S.C. § 78u–4(b)(2),[23]

**22.** The *Read–Rite* court noted, "Generally, all of the cases cited by Plaintiffs in which scienter was found to be adequately pleaded via the Epstein presumption either are pre-Re-

form Act or out-of-circuit decisions." *Id.* at *6 n. 2.

**23.** Section 78u–4(b)(1) & (2) require a plaintiff to plead that a defendant made a state-

as well as contrary to its underlying policy of protecting defendants from unwarranted claims and strike suits); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998)(the "judicial presumption" of group pleading could not "be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant"); *Marra v. Tel–Save Holdings, Inc.,* 1999 WL 317103, *5 (E.D.Pa.1999)("the presumption inherent in group pleading is inconsistent with the PSLRA's purpose ... since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be plead with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind' "; also PSLRA now "allows plaintiffs to plead upon "information and belief" that a statement is misleading provided that the complaint states with particularity all facts on which this belief is formed"). Holding that the group pleading doctrine survived the PSLRA are *inter alia In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y. 1999)("the PSLRA has not altered the group pleading doctrine"); *In re Miller Industries, Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1329 (N.D.Ga.1998); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998); *In re BankAmerica Corp. Sec. Litig.,* 78 F.Supp.2d 976, 988 (E.D.Mo.1999)(group pleading doctrine "has nothing to do with scienter," is "a rebuttable presumption applicable only to a limited group of persons within the company [officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company]," and "is not inconsistent with the PSLRA"); *In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 17 (D.D.C.2000). Somewhere in between is *McNamara v. Bre–X Minerals Ltd.,* 57 F.Supp.2d 396, 427 (E.D.Tex.1999)("Plaintiffs have relied too heavily on the group pleading presumption. More particularization is required .... Plaintiffs should, when possible, avoid attributing actions to ... Defendants collectively. When not possible the Plaintiffs should offer an explanation as to why this is the case."). Because this Court believes a more stringent pleading is required by the PSLRA, it agrees with those district courts that find the group pleading doctrine is at odds with the PSLRA and has not survived the amendments.

In addition, without identification of *any* specific documents, meetings, telephone calls, reports, etc., that Defendants read or participated in or should have read or participated in that would have or should have made them aware of specific wrongdoing in the Detroit plant under the direction of George and Roeser, who had worked for USL's predecessor and had been engaged in this conduct prior to USL's acquisition of City Environmental, and given Plaintiffs' own allegations regarding George and Roeser's extensive efforts to conceal the illegal dumping, Plaintiffs' scienter pleading suffers because of two major obstacles for which they have not adequately accounted: the geographical distance from City Environmental in Detroit to corporate headquarters in Houston, in light of the fact that USL has forty other facilities nationwide to supervise, and the reverse timing of the alleged misrepresentations and omissions as they relate to the dumping and its exposure by federal investigation. With respect to the latter, the challenged March 12, 1999 prospectus with its alleged misrepresentations and omissions was issued five months before the govern-

ment or omission, and "with respect to each act or omission alleged ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

ment raid that exposed the illegal dumping and its cover-up in Detroit. In essence, it appears to the Court that because Plaintiffs have not pleaded with particularity any facts that would support an inference of knowledge in the Houston office of the dumping in Detroit before the revelation of the search of the Detroit plan in August 1999, no less any specific facts regarding the other facilities, that Plaintiffs are impermissibly pleading fraud by hindsight, based on the results of the investigation of the Detroit facility. Indeed the general and conclusory allegations against all the other facilities appear to be generalizations that Plaintiffs have drawn from the specific problems of the Detroit plant and applied without any supporting facts in these other acquired facilities.

**D. Claims under the Securities Act of 1933**

■ As indicated earlier, to state a claim under § 11, 15 U.S.C. § 77k(a), a plaintiff must show "(1) that the registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material, that it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir.1994), *cert. denied*, 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995). A plaintiff is not required to demonstrate scienter under § 11, and a defendant will be liable for innocent or negligent material misrepresentations. *Id.*

■ To recover under § 12(a)(2), 15 U.S.C. § 77*l*(a)(2), a plaintiff must demonstrate that the defendant, as a seller of a security, misrepresented or failed to state material facts as to the plaintiff in connection with the sale. *Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir.1981). The plaintiff must also show that he had no knowledge of untruth or omission. *Id.* The plaintiff is not required to show that the defendant acted with scienter or that the plaintiff relied in any way on the defendant's misrepresentations or omissions.

■ Nevertheless, where § 11 and § 12(a)(2) claims sound in fraud, the plaintiff is required to plead the circumstances constituting the alleged fraud with particularity under Rule 9(b). *Melder v. Morris*, 27 F.3d 1097, 1100 n. 6 (5th Cir. 1994)("When 1933 Securities Act claims are grounded in fraud rather than negligence ... Rule 9(b) applies"); because plaintiffs' complaint contained a "wholesale adoption of the allegations under the securities fraud claims for purposes of the Securities Act claim," they were dismissed for failure to satisfy Rule 9(b); *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 & n. 3 (9th Cir.1996), *cert. denied sub nom. Anderson v. Clow*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997).

■ Plaintiffs' claims under the Securities Act of 1933 are mainly based on the March 12, 1999 Registration Statement/Prospectus (challenging its erroneous statements about USL's due diligence process in acquiring companies with histories of and ongoing violations, regulatory and compliance programs that USL instituted for its acquisitions, and USL's compliance with applicable environmental laws and regulations) and the fact that Defendants were signatories thereto.[24] Plaintiffs

---

**24.** Plaintiffs argue that Section 11 of the Securities Act imposes liability if "any part" of a registration statement, when effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading ...." 15 U.S.C. § 77k; *Isquith v. Middle S. Utils., Inc.*,

847 F.2d 186, 207–08 (5th Cir.1988). A plaintiff may sue the issuer, every person who signed the statement, and every person who was a director of the issuer. 15 U.S.C. § 77k(a)(1)-(3). A plaintiff who purchases a security issued pursuant to a registration statement need only demonstrate a material

maintain that Rule 9(b) is not applicable to their § 11 and § 12(a)(2) claims, and that they need only satisfy Rule 8(a)'s requirement of a short and plain statement of the claim. They emphasize that the complaint at ¶¶ 127 [25] and 134 [26] expressly disavows reliance on or incorporation of any allegation of securities fraud for purposes of the Securities Act claims.

The Fifth Circuit has just issued an opinion that limits the holding of *Melder* and makes clear that where a complaint does not allege that the defendants are liable for fraudulent or intentional conduct, where it disavows and disclaims any allegations of fraud in its strict liability 1933 Securities Act claims, its claims do not "sound in fraud" and they cannot be dismissed for failure to satisfy Rule 9(b). *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 366–69 (5th Cir.2001). Thus, given the express disavowal of those elements in the complaint that relate to fraud to the fraud claims in the Securities Act claims, the Court finds that Plaintiffs have stated claims under the 1933 Act.

## E. Control Person Liability

As noted earlier, the claims for alternative control person liability under Section 15 of the Securities Act of 1933 15 U.S.C. § 77o, and under Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t, require as a prerequisite that an underlying primary violation of the same Act by the controlled person be pleaded. *See, e.g., Splash*, 2000 WL 1727377, at *25–26 ("In order to state a claim for control person liability, plaintiffs must allege (1) a primary violation of the federal securities laws and (2) that the alleged controlling person possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the individual allegedly liable for the primary violation."). Thus the controlled person must have violated § 12(a)(2) or § 10(b) before the control person can be liable under § 15 of the Securities Act of 1933 or § 20(a) of the Exchange Act, respectively.

█ Because the Court has found that Plaintiffs have failed to plead their Exchange Act claims adequately, they have also failed to state a claim for control person liability under § 20(a) of the Exchange Act.

In sum, for the reasons indicated above, the Court

ORDERS that Defendants' motion to dismiss is DENIED as to Plaintiffs' claims under the Securities Act of 1933, but is GRANTED as to Plaintiffs' claims under the Exchange Act of 1934. Plaintiffs are granted leave to file an amended com-

---

misstatement or omission to make a *prima facie* case for liability. *Herman & MacLean v. Huddleston*, 459 U.S. at 381–82, 103 S.Ct. 683. The issuer's liability is "virtually absolute," even for innocent misstatements, insist Plaintiffs.

Section 12(a)(2) of the Securities Act also imposes liability on "[a]ny person who ... offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances in which they were made, not misleading." 15 U.S.C. § 77l(a)(2). USL issued the March 12, 1999 registration statement/prospectus and individual Defendants were signatories to it and are thus liable under §§ 11 and 12(a)(2).

**25.** Paragraph 127 of the complaint, setting for a claim under section 11 of the Securities Act of 1933, 15 U.S.C. § 77k and § 77o, expressly incorporates ¶¶ 1–125 of the complaint "except to the extent such allegations charge defendants with intentional or reckless misconduct.... Allegations that may be interpreted to sound in fraud and allegations relating to scienter are expressly not incorporated in this Count."

**26.** Same as ¶ 127, but applying to Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l and § 77o.

plaint, if they are able, to cure the pleading deficiencies under the PSLRA and the Exchange Act or to inform the Court that they will not do so, within thirty days of receipt of this order. If appropriate, Defendants may file a supplemental motion to dismiss.